UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TINA WAITS,
    PLAINTIFF

VS.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL
SECURITY,
    DEFENDANT

CASE NO. 1:06CV589
(WEBER, J.)
(HOGAN, M.J.)

REPORT AND RECOMMENDATION

Plaintiff filed her application for Disability Insurance Benefits and Supplemental Social Security Income in May, 2003. Her application was denied both initially and upon reconsideration. She then requested and obtained a hearing before an Administrative Law Judge (ALJ) in January, 2006 at Cincinnati, Ohio. Plaintiff was represented by counsel at the hearing, at which she testified, as did Janet Rogers, a Vocational Expert (VE). In February, 2006, the ALJ reached an unfavorable decision, and in March, 2006, Plaintiff processed an appeal to the Appeals Council, which considered additional evidence, but finally denied review in September, 2006. Plaintiff timely filed her Complaint seeking judicial review in September, 2006.

---

[1] On February 12, 2007, Michael J. Astrue became Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. §405(g), Michael J. Astrue is automatically substituted as the Defendant in this civil action.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made two errors prejudicial to her case: (1) The ALJ erred in finding that Plaintiff did not meet or equal Listing 1.04(A) and (2) The ALJ erred in formulating Plaintiff's residual functional capacity as a basis for requesting an expert opinion by the VE.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was 41-year-old divorced female, right-handed, 5'3" tall and weighed approximately 153 lbs. She is a high school graduate with one year of college. She lives in an apartment with her two sons, age 13 and 17, who do the laundry and shopping, and a male roommate. Her last employment was in early May, 2001, when she was an office manager/buyer for a costume company. Prior employment from 1989 to 1997 was in customer service for a call center. In 1998, she worked as a team leader and marketing project manager for United Airlines. She had back surgery in April, 2001 and was unable to work after May, 2000 because of back pain.

Plaintiff testified that she had epidural injections prior to back surgery in an attempt to alleviate pain from a protruding disc. Dr. Stern then performed a laminectomy, but scar tissue grew into the nerves and caused pain "across the hips, down both legs, mostly on the left side." She described being unable to lie down since the surgery, having to switch positions every 10-15 minutes and being unable to sleep. She described sleeping in a recliner and has undergone epidural injections, nerve blocks and physical therapy. She currently takes Neurontin and Ultram, but was previously taking Flexeril and MS Contin. She uses heat and ice to alleviate pain. Her level of pain is "9" on a 10-point scale without medication and an "8" with medication. She emphatically denied "snorting Morphine" when she was in the hospital in July, 2006, but did admit that there was a problem caused by the mixing of Adavant and Morphine, two medications

2

that were prescribed for her.

Plaintiff admits to suffering from depression, a condition for which she has neither sought nor received treatment by any mental health provider. She is a licensed driver, but seldom drives and then for only short distances. She estimates that she can stand/walk and sit for 15 minutes at a time before needing to change positions.

After her laminectomy, she returned to Dr. Tuttle for a series of epidural injections and nerve blocks, neither of which were effective in reducing her pain to a manageable level. Her doctor recommended a subsequent surgery called a "fusion" by Dr. Stanbaugh, but her medical coverage ceased and since, she has treated with her primary care physician and received medications.

Plaintiff testified that she experiences constant low back and neck pain as well as pain, tingling and numbness in her left leg and in August, the leg "gave out," causing a fall down the steps and four broken ribs as well as a torn rotator cuff on the right shoulder. The left leg "gives out" at the rate of "a couple of times a day."

When asked by her counsel if there was anything additional she wanted to tell the Court, Plaintiff responded: "Just that my main goal to be here is to get some help to get fixed so I can go back to work, so I can get involved with my children again. . . I would like to find a surgeon, get fixed and hopefully go back to work."

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's first residual functional capacity assessment, put in the form of a hypothetical question to the VE, asked her to assume that Plaintiff could perform sedentary work, but would be restricted from high stress jobs (such as those requiring production quotas and frequent public interaction). The VE identified the jobs of sedentary bench assembler, laborer and inspector, all of which are found in significant numbers in the national economy. The second hypothetical

3

simply eliminated the restriction relative to public interaction. The VE then responded that there are a representative number of general clerical jobs in the national economy. The third hypothetical asked the VE to reassert the same restrictions in the first hypothetical and add an inability to reach overhead with the right hand. The VE responded that there might be a slight reduction in the number of jobs, but those jobs would still exist in representative numbers. The fourth and last hypothetical asked the VE to assume the restrictions indicated by Dr. Gluntz, Plaintiff's primary care physician, on Exhibit 12F. The VE responded that Plaintiff would be unemployable.

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff had severe impairments of "low back pain with a post laminectomy syndrome, a right shoulder strain, and a depressive disorder." The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, but that she cannot reach overhead, nor perform work which requires production quotas or involves frequent public interaction.

## MEDICAL RECORD

Plaintiff had a "small prepyloric ulcer with surrounding erosive antritis" removed by David Mangels, M.D. in October, 1999 at Jewish Hospital. (Tr. 105-106). In January, 2002, Plaintiff had steroid injections at L5 and S1 on the left by Lawrence Zeff, M.D. She had had a previous laminectomy and discectomy at L4-5 and L5-S1, but developed scar tissue around the left S1 nerve root. (Tr. 109-110). In March, 2002, Plaintiff also had epidural steroid injections by Dr. Zeff at right C6, right C5, left L5 and a caudal epidural steroid injection. (Tr. 112-113). In May, 2002, Plaintiff had facet joint injections at C3-4, C4-5, C5-6 and C6-7 on the right, L3-4,

4

L4-5 and L5-S1 on the left. (Tr. 116-118). These injections were attempts to alleviate Plaintiff's complaints of neck and low back pain.

A CT of the left paraspinal sinus was done in July, 2000. The CT scan showed "mild mucosal membrane thickening and/or retention cyst formation in the interior left maxillary sinus" and a "mild nasal septal deviation towards the right." (Tr., Pg. 121). In September, 2001, a bone scan of three planes of the spine was "unremarkable." (Tr., Pg. 124).

Plaintiff was seen by Thomas Shockley, M.D. in November, 2000 for back pain. The history given to Dr. Shockley indicated that Plaintiff injured her back in January, 2000 while bending over to pick up an object. She has had physical therapy, some chiropractic treatment, has done exercises and has used a TENS unit. Dr. Shockley's examination showed that Plaintiff could only flex her back to 30 degrees and laterally bend to 10 degrees. Straight leg raising was negative. X-rays showed mild arthritic changes at L5-S1. Dr. Shockley recommended that Plaintiff get an MRI and prescribed Ultram and Flexeril. The MRI showed "evidence of L4-5 noncompressive disc displacement and a central L5-S1 disc protrusion abutting the thecal sac in both the S1 nerve roots." Dr. Shockley added Vicodin and suggested epidural injections. In February, 2001, Dr. Shockley reported that Plaintiff has "tenderness in the lumbosacral junction, positive straight leg raising and sensory loss, although there was no muscular atrophy or muscular weakness." She complained of low back pain radiating down both legs, but more on the left.(Tr. 131-137).

Dr. Shockley referred Plaintiff to Karol Hoffman, M.D., a pain therapist, for treatment of Plaintiff's chronic lower back pain and bilateral leg pain. Dr. Vickers, an orthopaedic surgeon had ordered two sets of physical therapy and then sent her to a chiropractor. She ended up with Dr. Shockley, who ordered an MRI and treated her with Ultram and pain killers. The MRI showed a "central L5-S1 disc protrusion abutting the thecal sac and both S1 nerve roots" and "noncompressive disc displacement was noted at L4-5." Dr. Hoffman injected Depo-Medrol at L-3 in December, 2000. (Tr. 140-141). The second injection of the same substance occurred in

5

January, 2000. (Tr. 142). Neither resulted in satisfactory improvement, so a lumbar laminectomy was done in February, 2001. Dr. Hoffman felt that Plaintiff's post-surgical pain was the result of the formation of scar tissue. He observed on several occasions that Plaintiff moves from the sitting to standing mode "with utter difficulties."

A second series of steroid injections began in July, 2001. A repeat MRI, which showed "a large foraminal left-sided herniation of the lumbosacral disc." There was positive straight leg raising in February, 2002. Errol Stern, M.D. recommended surgical decompression. (Tr. 143-155). In May, 2001, Dr. Stern injected Depo-Medrol and Marcaine in the lumbosacral area and prescribed Ultram and Vicadin. In August, 2001, Dr. Stern recommended physical therapy and exercise. A repeat MRI indicated the presence of "granulation tissue around the S1 nerve root, which is the cause of her low back and leg pain." (Tr. 156-160). Dr. Stern indicated in September, 2001, after the passage of five months since her last surgery, that Plaintiff continues to have "chronic back pain." He indicated that she has "granulation tissue around the surgery site." He recommended exercise and training in body mechanics. In October, 2001, Dr. Stern referred Plaintiff to Dr. Zeff for an epidural injection directly into the S1 nerve root. That also was ineffective in giving Plaintiff any relief. Plaintiff complained of neck pain, but she had full range of motion in the neck and x-rays of the cervical spine showed only "minimal degenerative changes." (Tr. 161-173).

Dr. Zeff referred Plaintiff to Ann Tuttle, M.D., a specialist in pain management. Dr. Tuttle recommended aquatic therapy, an increased dosage of Neurontin and repeat epidural injections with a greater spread. (Tr. 175-177). Plaintiff had an epidural injection of this type in July, 2002. (Tr., 178-182).

William Gluntz, M.D., reported in September, 2003 that Plaintiff had been treating with him for an eight-month period for chronic back pain. Dr. Gluntz renewed and somewhat changed her medications. His opinion was that Plaintiff had a "debilitating and chronically painful back." (Tr. 183-184).

6

Plaintiff was evaluated in October, 2003 by Judith Wachendorf, M.D. Dr. Wachendorf indicated that Plaintiff had an abnormal gait, decreased range of motion of the back, tenderness from L2 distally and both sacroiliac joints as well as an absent left ankle reflex and numbness in an S1 distribution. She also displayed normal leg strength and had negative straight leg raising from a seated position. She displayed a decreased range of motion in the neck and tenderness over the trapezius muscle, but had a negative Spurling's Maneuver and normal strength, sensation and reflexes. Dr. Wachendorf's opinion was that Plaintiff could sit for 15 minutes at a time, stand for 10 minutes at a time and that she would be limited from walking, lifting and carrying. (Tr. 186-187).

A Residual Functional Capacity Assessment was made by Charles Derrow, M.D., in November, 2003. Dr. Derrow's opinion was that Plaintiff could lift 10 lbs. occasionally, and less than 10 lbs. frequently. She could stand/walk for 2 hours in a workday and sit for approximately 6 hours. She must be allowed to alternate between sitting and standing to alleviate pain. She should never climb ladders, but could frequently balance and occasionally climb a ramp or stairs, crawl, crouch, stoop or kneel. She should avoid exposure to hazards. (Tr. 192-197).

Plaintiff was evaluated by Paul Deardorff, Ph.D., a clinical psychologist, in March, 2004. Dr. Deardorff diagnosed Plaintiff with Major Depression, assigned a GAF of 55, and indicated a moderate impairment of her ability to relate to others, a moderate impairment of her ability to understand, remember and follow directions, a moderate impairment of Plaintiff's ability to maintain attention, concentration, persistence or pace and a moderate impairment of her ability to withstand stress. (Tr. 198-203). A similar evaluation was done by Steven Meyer, Ph.D., also a clinical psychologist, in May, 2004. Dr. Meyer found that all Plaintiff's impairments in the categories described by Dr. Deardorff were "mild to moderate" and agreed with the diagnosis of Major Depression. (Tr. 204-219).

Dr. Gluntz, Plaintiff's primary care physician, completed his own medical assessment of ability to do work-related activities in February, 2005. Dr. Gluntz indicated that Plaintiff suffers

7

from chronic back pain and that her symptoms are "daily pain, analgesic gait, stooped posture and sacro-iliac tenderness." Dr. Gluntz opined that Plaintiff should not lift more than 5 lbs, cannot stand/walk longer than 1 hour in a workday and sit longer than 15 minutes at a time. Dr. Gluntz opined that Plaintiff could frequently balance, but should never climb, stoop, crouch or crawl, but could occasionally kneel. Dr. Gluntz saw no mental/emotional impairments, save the ability to use proper judgment, maintain attention and concentration and to understand, remember and carry out complex instructions, and all three of the mental emotional deficits were suggested by Plaintiff, rather than observed by the doctor. A fair interpretation of Dr. Gluntz's remarks regarding Plaintiff's mental/emotional deficits is that he doesn't disagree with Plaintiff's own assessment, but lacks the information necessary to form his own opinion. (Tr. 221-241).

Plaintiff fell down the stairs at her home in August, 2005. She was treated at Bethesda North Hospital by Gregory Boldt, M.D., who ordered x-rays, which showed right side and multiple rib fractures of the 5th through 8th ribs. (Tr. 243-244). After being treated at Bethesda North Hospital, Plaintiff saw Nicholas Mirkopoulos, M.D., an orthopaedic surgeon. Dr. Mirkopoulos found no evidence of a dislocated shoulder, put her right arm in a sling and prescribed Vicodin and Tylenol #4. (Tr. 243-246 and 268-269).

In July, 2005, Plaintiff was brought to the emergency room at Bethesda North Hospital by her husband who told the nurses that his wife was difficult to rouse and was talking incoherently. She had experienced some shaking of her left hand and had been sleep walking recently. A CT scan of her head was done and the results were "unremarkable" as were blood and urine tests. A drug screen showed an overdose of opiates and Plaintiff eventually doubling and tripling her prescribed morphine. (Tr. 260-265).

Finally, there is an emergency room report from Jewish Hospital in October, 2005. Plaintiff fell when her "knee gave out" and sustained an injury to her right shoulder. Since x-rays were negative relative to fracture or dislocation, Hollynn Larrabee, M.D. diagnosed the problem as a shoulder strain and prescribed Flexeril and Tylenol #3. (Tr. 271-275).

8

**OPINION**

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(I), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done,

9

or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

10

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

11

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in

all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway*

13

*v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17

14

F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff's first Statement of Error asserts that the ALJ erred when she failed to find that Plaintiff's low back problem did not meet or equal Listing 1.04(A). The first requirement of the Listing is that Plaintiff show one of a series of spinal disorders, two of which are degenerative disc disease and herniation of the nucleus pulposus Defendant doesn't argue that Plaintiff doesn't have degenerative disc disease or disc herniation and the record fully supports that she has both. Plaintiff injured her back while bending over to pick up an object. A pre-surgical MRI showed L5-S1 disc displacement. After attempts at physical therapy, exercise, chiropractic manipulations, steroid injections and the use of medications, as well as a TENS unit, a laminectomy was performed by Dr. Stern in February, 2001. Plaintiff's low back pain was not alleviated by either the laminectomy or the post-surgical injections. All of Plaintiff's physicians, Drs. Zeff, Shockley, Stern, Hoffman and Gluntz agree that there is an objective source for Plaintiff's subjective reports of low back pain. The most likely source for her present pain is scar tissue or "granulation tissue" around the surgical site.

The second requirement of the Listing is that Plaintiff show evidence of nerve root compression characterized by neuro-anatomic distribution of pain. Literally all of Plaintiff's treating physicians agree that Plaintiff has low back pain, radiating into the legs and particularly the left leg. Dr. Zeff so found. (Tr. 109, 112, 116). Dr. Shockley so found and prescribed Vicodin for pain. (Tr. 136, 137). Dr. Hoffman, a pain specialist, so found. (Tr. 140-143). Dr. Stern so found and prescribed Ultram for pain. (Tr. 153, 160, 161). Dr. Tuttle, a pain specialist, agreed, (Tr. 175) as did Dr. Wachendorf (Tr. 185). Dr. Gluntz, Plaintiff's primary care

15

physician, referred to her pain as "debilitating." (Tr. 183).

The third requirement of the Listing is that Plaintiff demonstrate limitation of motion of the spine. Again, there is virtual agreement among the treating physicians. Dr. Shockley so found. (Tr. 135, 136). Dr. Zeff so found. (Tr. 170). Dr. Tuttle so found (Tr. 176) as did Dr. Wachendorf (Tr. 186).

The fourth element is motor loss, demonstrated by atrophy associated with muscle weakness or muscle weakness and accompanied by sensory or reflex loss. It is the element of motor loss which is the basis of disagreement between the parties in this case. Plaintiff asserts that the record demonstrates motor loss, while Defendant contends that Plaintiff's medical record does not demonstrate motor loss. Plaintiff lists nine pages in the record where motor loss is arguably demonstrated. The first is at Page 140, the report of Dr. Hoffman. We agree with Defendant that Dr. Hoffman makes no reference to motor loss. He does make reference to "numbness and tingling." but these are evidence of sensory loss, not motor or muscular loss. At Page 144, also cited by Plaintiff, Dr. Hoffman makes reference to Plaintiff's difficulty getting into and out of a chair. Although this is possible evidence of motor loss, it could be evidence of pain without motor loss. We simply do not know because Dr. Hoffman does not say. At Page 166, also cited by Plaintiff, Dr. Stern fails to mention the term "motor loss," but he does make some findings that are inconsistent with motor loss, such as "no nerve root impingement" and " no neurological deficit of the lower extremity." At Page 170, Dr. Zeff makes no mention of motor loss, but he does say that muscle strength was good. Page 172, also cited by Plaintiff, refers to the MRI report of March, 2002. The MRI describes a disc protrusion at L4-L5 "without nerve root displacement." An MRI is an analytical tool; motor loss is a functional term. The MRI would not support a motor loss and, in fact, would evidence a lack of motor loss.

Dr. Wachendorf at Page 186 of the record finds that muscle strength was normal and that "atrophy was not present." However, as Plaintiff points out, she did indicate "give way weakness" in reference to muscle testing of Plaintiff's left hip, knee and foot. She also indicated

16

a failure to walk on her left heels and a refusal to walk on her left toes. Plaintiff suggests that these two things illustrate muscle or motor loss. Our interpretation is that they may or may not. Dr. Wachendorf does not say. At Page 194 of the record, Dr. Derrow opines that Plaintiff has limited ability to push/pull with the lower extremities. Plaintiff interprets this finding as showing muscle weakness and therefore motor loss. Dr. Derrow specifically found "the claimant's strength is normal," so Plaintiff's interpretation is obviously erroneous. In any event, a residual functional capacity assessment that limits one's use of the lower extremities may be based on impairments other than muscle weakness.

Next, Plaintiff cites us to Page 268, the Emergency Room report from Bethesda North Hospital. Although Defendant finds it incredulous that Plaintiff would cite the report of a shoulder injury as proof of motor loss resulting from a disc problem, the shoulder injury resulted from a fall down a staircase. The fall occurred when Plaintiff lost her balance. Plaintiff argues that this fall, coupled with Dr. Wachendorf's findings, shows motor loss. All we can say is that the sum total of Plaintiff's proof contains an inference that there may have been motor loss, but the converse is also true. We simply do not know.

The last requirement of the Listing is positive straight leg raising if the lower back is involved, which it surely is. Again, the evidence is in dispute. Dr. Shockley found negative straight leg raising in November, 2000. Dr. Stern found positive straight leg raising in February. 2001 and did Dr. Gluntz in September, 2003. The more recent evidence shows that straight leg raising was positive.

Plaintiff's first Statement of Errors can be resolved on a burden-of-proof basis. Plaintiff has the burden and simply failed to meet it. The ALJ did not err in evaluating Plaintiff's proof under Listing 1.04(A).

In her second Statement of Errors, Plaintiff asserts that the ALJ's residual functional capacity assessment should have been more restrictive as it unfairly described the Plaintiff's impairments and led to an erroneous opinion by the VE. The ALJ's residual functional capacity

17

assessment limited Plaintiff to sedentary work which involved no high stress component and which did not require her to reach overhead. The limitation to sedentary work was designed to accommodate Plaintiff's chronic low back pain. The prohibition against reaching overhead was designed to accommodate Plaintiff's shoulder injury. The restriction to jobs which did not have production quotas nor involve extensive public interaction was designed to accommodate the opinions of Drs. Meyer and Deardorff that Plaintiff suffered from depression, even though neither found any marked or severe limitations in Plaintiff's ability to withstand stress.

Residual functional capacity assessments were made by Drs. Derrow, Wachendorf and Gluntz. Dr. Derrow's opinion was that Plaintiff could stand/walk for 2 hours and sit for 6 hours in a workday. Dr. Wachendorf's opinion was that Plaintiff could stand/walk for 15 minutes at a time and stand for 10 minutes at a time. She failed to convert these "at a time" limitations for a workday. When Dr. Wachendorf's limitations are converted to workday numbers, the two opinions are quire similar. Although Dr. Gluntz's opinion is considerably more restrictive and conceding that Dr. Gluntz is a treating physician with more than a few contacts with Plaintiff, it still is apparent that Dr. Gluntz is an internist, not a specialist in neurology or orthopaedics, that his opinion is based on Plaintiff's subjective reports and that his opinion is somewhat inconsistent with the totality of the medical evidence. The ALJ's residual functional capacity assessment constituted a fair description of Plaintiff and her formulation of it was not erroneous.

## CONCLUSION

The record shows that the Plaintiff has a significant impairment, from which she is in a lot of pain. The record also implies that she is becoming increasingly more desperate in her desire to rid herself of the pain from which she suffers. Her desire to return to the workforce seems sincere. Nevertheless, the evidence before us fails to show a Listing level impairment and it also fails to show any error in the ALJ's formulation of the residual functional capacity

assessment.  For the foregoing reasons, Plaintiff's assignments of error are without merit.  The ALJ's decision is supported by substantial evidence and should be affirmed.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be AFFIRMED and this case be dismissed from the docket of the this Court.

January 31, 2008

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).